Filed 7/16/13  P. v. Rodgers CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RONNIE RODGERS,<br><br>        Defendant and Appellant. | A135209<br><br>(San Francisco City and County<br>Super. Ct. No. 2353889) |

Ronnie Rodgers was charged with attempted murder, assault with a deadly weapon, and making criminal threats after attacking a hotel manager with a pair of scissors.  The jury heard evidence of four prior stabbing incidents by Rodgers, with consideration of the evidence limited to the issue of whether Rodgers acted with the intent to kill in the current assault.  The jury acquitted Rodgers of attempted murder, but convicted her of the other charges.  Rodgers argues the limiting instruction given to the jury improperly allowed the jury to consider the prior bad acts evidence with respect to the criminal threats charge.  We disagree and affirm.

## I.    BACKGROUND

In February 2008, Ronnie Rodgers was charged with attacking Shaker Dahud with a pair of scissors at the Hurley Hotel in the Tenderloin neighborhood of San Francisco. The operative second amended information charged Rodgers with attempted murder (Pen. Code, §§ 664, 187, subd. (a);[1] count 1); assault with a deadly weapon (scissors)

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

1

(§ 245, subd. (a)(1); count 3); and making criminal threats (§ 422; count 5).[2]  As to count 1, it was alleged that Rodgers used a deadly weapon (scissors).  (§ 12022, subd. (b)(1).)  As to all counts, it was alleged that Rodgers was ineligible for probation pursuant to section 1203, subdivision (e)(4); that she had two prior convictions within the meanings of section 667, subdivisions (a)(1), (d) and (e) and section 1170.12, subdivisions (b) and (c); and that she had served a prior prison term within the meaning of section 667.5, subdivision (b).

A.    *Trial Evidence on Charged Offenses*

In July 2007, Dahud became the manager and Harold Hunt became the assistant manager of the Hurley Hotel, where Ronnie Rodgers lived.  Dahud testified that Rodgers struggled with "constant alcohol and drug addiction," drank alcohol and smoked crack cocaine, and would stay up all night yelling and screaming.  She frequently yelled in a "violent" tone in her room, in the lobby, and on the street, and she would curse and make threatening statements.  In about January 2008, Dahud evicted Rodgers due to this behavior and helped move her to a different hotel.  Rodgers, however, would frequently come back to the Hurley and ask Dahud, Hunt and others for money.  Dahud often gave her money because she was loud, "in your face," and would not take no for an answer.[3]

On February 4, 2008, Rodgers came by the hotel three times.  On the first two occasions, Dahud noticed that she was under the influence of alcohol or drugs.  When she returned at 11:00 p.m., she was violent and loud as usual.  Hunt buzzed her in through the outside front door, then slightly opened the door to the lobby.  Rodgers pushed by him, entered the lobby, and walked into the office where Dahud was situated.  She loudly yelled, cursed and asked for money.  Dahud told her he had no money, yelled at her to leave, and pushed her away.

---

[2] The information included additional charges and allegations that were dismissed during trial.

[3] Hunt similarly testified that Rodgers regularly got high or drunk when she received money at the beginning of each month, and when she got high she became a different person, "like a [were]wolf," and would scream at all hours of the night.  However, Hunt never had any violent incidents with Rodgers or known her to be violent.

As Dahud turned partially away from Rodgers, he saw that she was holding a pair of about eight-inch scissors at her eye level. Dahud grabbed the hand holding the scissors to protect himself. Rodgers, who was very aggravated, ripped Dahud's shirt and the tip of her scissors almost touched Dahud's stomach. They then struggled on the ground. At first, Rodgers was face down and Dahud was on her back, still holding onto the scissors. Dahud told Rodgers to let go of the scissors but she would not do so. Then Rodgers got loose and turned face up, cutting Dahud's pants and scratching his legs with the scissors in the process. Dahud managed to regain control over her. At another point, Rodgers attempted to stick Dahud in the hand with the scissors and cut him, but he was able to stop her. The scissors came within eight inches of Dahud's face. Rodgers also tried to bite him. Dahud finally was able to take the scissors from Rodgers and he let her stand up. The police then arrived.

Dahud testified that, during the struggle, Rodgers yelled, "Let me go"; "I'll get you, you mother fucker"; "I'll kill you"; "I'll see you outside"; "I'll get my people to get you." At the time, Dahud took these threats seriously. He considered it a different situation from other times when she had made threats because this time she had a weapon in her hand.

Rodgers testified in her own defense. On February 4, 2008, she drank vodka and smoked crack cocaine. At about 11:00 p.m., she went to the Hurley Hotel to pick up her mail. She recalled that Hunt buzzed her in through the front door and Dahud was over by the office door. She then "blanked out or something." She testified, "[T]he next thing I know, I'm on the ground, and I can't breathe, and he's on top of me. And I . . . had these scissors in my hand. And he was telling me . . . [whenever] you give me the scissors, . . . I'll let you up, and that's what I did." Rodgers testified that when Dahud was on top of her, she scrounged around in her pocket or bag and grabbed the scissors to get Dahud off of her. She did not recall yelling at Dahud during the incident.

B.      *Prior Bad Acts Evidence Presented at Trial*

The trial court admitted evidence of four prior stabbings committed by Rodgers pursuant to Evidence Code section 1101, subdivision (b) and allowed the People to

3

impeach Rodgers with a manslaughter conviction in one of the incidents. The prosecutor argued that the evidence was admissible to establish the specific intent to kill on the attempted murder charge, the "seriousness of the intent in the 422 threats case," and the general intent on the assault charge, "that the attempted stabbing in this case was not the result of mistake or accident." The court ruled the evidence was probative on the issue of intent under the rationale that "the more often that one does something, the more likely it is that something was intended rather than accident or spontaneous."

The following evidence of the prior offenses was presented at trial.

In 1985, Thomas Kardos was stabbed in the back while he was in Logan's Bar in the Tenderloin. Kardos told police the assailant told him, "You're the one who murdered me." A witness to the stabbing gave police a description of Rodgers and directed them to a bar known as a hangout for methamphetamine users. Police located Rodgers there and found a bloody pair of scissors in her pocket. She was very agitated and emotional. As Rodgers was being transported to jail, she told police she stabbed Kardos because she had given him money for crank (methamphetamine) and he had stolen the money.

In 1988, Anthony Lacey was stabbed to death at the Vincent Hotel in the Tenderloin. An audio recording of a police interview with Rodgers about the incident was played for the jury. Rodgers said she went to the Vincent Hotel to get some belongings from a friend when she encountered Lacey. She hated Lacey because he had stolen a radio from her and her friend and because he had pushed her around a few days earlier, demanding money. She told police she had tried to put the incidents behind her, but she "couldn't stay away. I had to go back and get" her things from her friend. She decided to stab Lacey if he ever laid a hand on her again and she made sure she was armed with a knife when she returned to the hotel. On the day in question, Rodgers told Lacey, "Fuck you" when she saw him. He responded by hitting her and she "rushed him" with a steel steak knife, stabbing him in the throat and chest. "I blanked out. I just hit him." Rodgers denied being intoxicated. She told police, "If I had to do it over again, . . . I'd do it again." Rodgers pled guilty to voluntary manslaughter in the case.

4

In 2004, James Collins was stabbed in the back in the Tenderloin. He told police he had been stabbed by his lover, Rodgers, in her apartment at the Hurley Hotel. Police located Rodgers at the Hurley: she was agitated, sweaty, loud, and angry, and she told the investigating officer that a "gangster" had asked her for sex and punched her when she refused, knocking over her television as he left. She chased him out of the room and stabbed him with scissors on the stairs. Police did not observe any injuries on Rodgers, but found a pair of scissors in her right rear pants pocket.

In 2007, Rodgers stabbed her lover, Leonard Boyland, in the face with a knife and carving fork in front of the Hurley Hotel. They had been smoking and drinking, but were not yet high, and they "got into it," with Boyland kicking Rodgers and saying he was going to leave her.

C.      *Jury Instructions*

The trial court gave the following instruction on consideration of the prior bad acts evidence: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other. [¶] The People presented evidence that Ms. Rodgers committed other offenses involving stabbing assaults that were not charged in this case. . . . [¶] . . . [¶] . . . If you decide that Ms. Rodgers committed the uncharged offenses, you may, but are not required, to consider that evidence for the limited purpose of deciding whether or not Ms. Rodgers acted with the intent to kill and whether her actions were the result of mistake or accident. [¶] . . . [Do] not consider this evidence for any other purpose except for the limited purpose of intent and lack of mistake or accident."

As relevant here, the court provided the following instructions on the two charged specific intent offenses:

"To prove that [Ms. Rodgers] is guilty of attempted murder, the People must prove: one, that Ms. Rodgers took at least one direct, but ineffective, step toward killing another person; and two, that she [intended] to kill that person."

"To prove that [Ms. Rodgers is] guilty of [having made a criminal threat], the People must prove: [¶] One, that she willfully threatened to unlawfully kill or unlawfully

5

cause great bodily injury to Chuck Shaker Dahud; [¶] Two, that she made the threat orally; [¶] Three, that she intended that her statement be understood as a threat; [¶] Four, the threat was so clear, immediate, unconditional, and specific that it communicated to Chuck Shaker Dahud a serious intention and the immediate prospect that the threat would be carried out; [¶] Five, the threat actually caused Chuck Shaker Dahud to be in sustained fear for his own safety; [¶] And, finally, his fear was reasonable under the circumstances. [¶] . . . [¶] Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act or intend to have someone else do so."

"The specific intent required for the crime of attempted murder is the intent to kill. The specific intent required for the crime of criminal threats is that the defendant intended that her statement be understood as a threat. [¶] The People must not only prove that Ms. Rodgers did the acts charged, but also that she acted with these particular intent[s] or mental state[s]."

D.    *Verdict*

The jury found Rodgers not guilty of attempted murder and guilty of assault with a deadly weapon and making criminal threats. The court found the prior conviction allegations true.

E.    *Motion for New Trial*

Rodgers moved for a new trial on the ground that the court erroneously admitted evidence of prior bad acts and misinstructed the jury on the use of that evidence. On the latter issue, Rodgers argued the court erred by not specifically instructing the jury *not* to consider the bad acts evidence with respect to the criminal threats charge. The prosecutor argued the evidence was relevant to the criminal threats charge because it "demonstrate[d] the seriousness of the threat on the part of the person making the statement," but the court disagreed, noting that a defendant can be guilty of making criminal threats even if she does not intend to follow through on the threat. The court tentatively concluded it had erred because "the instruction should not have referenced the prior [bad acts] with respect to [section] 422," the criminal threats charge, and the error might not have been harmless. The court gave the parties an opportunity to submit

6

supplemental briefing on the issue. After the supplemental briefing, the court concluded there was no instructional error. "The only issue is whether the 1101(b) evidence was connected to the 422 charge. . . . [I]t's not. . . . [¶] . . . [¶] . . . [T]he instructions that were given to the jury told them that they could consider the 1101 evidence for purposes that are not connected to any of the elements of the 422 charge."

F.     *Sentence*

The trial court struck one of the prior convictions pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. For the assault conviction, the court imposed the three-year middle term, doubled the term for a prior conviction, and imposed consecutive five-year terms for the two prior serious felony enhancements, for a total prison term of 16 years. On the criminal threats conviction, the trial court imposed the two-year middle term, doubled the term to four years based on the prior conviction, and stayed the sentence pursuant to section 654. The court imposed various statutory fines and fees. It awarded Rodgers 1,505 days of actual presentence credits and 225 days of conduct credits for a total of 1,730 days of credit.

## II.     DISCUSSION

On appeal, Rodgers challenges the limiting instruction on the jury's use of the prior bad acts evidence, but does not renew his challenge to the admission of the evidence itself. Rodgers argues the instruction as given permitted the jury to consider the evidence with respect to the required specific intent for the criminal threats charge. We disagree.

Although a trial court has no sua sponte duty to provide a limiting instruction on the use of prior bad acts evidence, if it provides such an instruction it must do so accurately. (*People v. Nottingham* (1985) 172 Cal.App.3d 484, 497.) In considering challenges to jury instructions, we view individual instructions in the context of the overall charge. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1075 (*Wallace*).) We assume the jurors are intelligent and use common sense when applying instructions. (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1396.) We reverse only if there is a reasonable likelihood that the jury would have returned a more favorable verdict if the instructional error had not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see e.g., *People v.*

7

*Humphrey* (1996) 13 Cal.4th 1073, 1089.) We reverse when instructions are ambiguous only if there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. (*Wallace*, at p. 1075.)

The challenged instruction here accurately stated that the prior bad acts evidence could be considered *only* on the issues of whether Rodgers acted with the intent to kill and whether her actions were the result of mistake or accident. The court accurately instructed that intent to kill was an element of the attempted murder charge and that the criminal threats charge required proof of different elements. Indeed, the court specifically distinguished the intent elements of the two crimes, instructing: "The specific intent required for the crime of attempted murder is the intent to kill. The specific intent required for the crime of criminal threats is that the defendant intended that her statement be understood as a threat." Because the instruction plainly directed the jury to consider the prior bad acts evidence only on an intent issue that was relevant to the attempted murder charge and not to the criminal threats charge, Rodgers's factual premise for her claim of error is incorrect.

Rodgers argues the instruction directed the jury to consider the evidence with respect to all "charges" indiscriminately. She refers to language indicating that the evidence was relevant to more than one charge: "In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged *offenses*. . . . [¶] . . . [¶] . . . If you conclude that Ms. Rodgers committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that Ms. Rodgers is guilty of the *charges*. The People must still prove *each charge* and allegation beyond a reasonable doubt." (Italics added.) "We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions. [Citations.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 594, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Thus, we must conclude that the jurors understood the very clear and specific statement in the instruction that the jurors could "not consider this evidence for any other purpose except for the limited purpose of

8

intent and lack of mistake or accident." We reject Rodgers's argument that the distinction between the intent element of attempted murder (intent to kill) and of the criminal threats charge (intent that statement be understood as a serious threat) was too fine for lay jurors to understand.[4] The court specifically instructed the jury, "Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act or intend to have someone else do so," thus expressly drawing the distinction. We fail to see how this explanation was ambiguous or confusing, or how reasonably intelligent lay jurors would misunderstand this common sense concept.

Moreover, the record of this particular trial does not support an inference that the jury misunderstood the challenged instruction. In closing argument, the prosecutor referred to the prior bad acts evidence only with respect to proving Rodgers's intent to kill on the attempted murder charge. He argued the prior incidents demonstrated that Rodgers brought the scissors with her to the Hurley Hotel because she anticipated a confrontation and intended to use it if that occurred. "This is no mistake. This is no accident." During deliberations, the jury focused on the intent to kill element, as evidenced by a jury question to the court about the meaning of the term. They then acquitted Rodgers of the crime that required proof of that element, attempted murder, and convicted her of the crime of making a criminal threat, which did not require proof of such intent. We find it implausible that the jury would have acquitted Rodgers of attempted murder (inferably having found a reasonable doubt about her intent to kill) and then convicted her of making a criminal threat under the mistaken impression that the required intent to convey a serious threat was equivalent to "intent to kill" and the jury could therefore consider Rodgers's prior bad acts in finding that element to be proven beyond a reasonable doubt.

---

[4] Rodgers does not argue that the jurors might have misapplied the "mistake or accident" language of the instruction.

Rodgers understandably draws our attention to the trial court's tentative conclusion at the first hearing on her motion for a new trial that it had erred in giving the limiting instruction it did. The court's comments, however, clearly indicate that the court was operating under the mistaken recollection that the instruction had permitted the jury to consider the prior bad acts evidence with respect to criminal threats charge. The court said, "[T]he instruction should not have referenced the prior [bad acts] with respect to 422. . . . Those convictions should have been limited to the other counts"; and "I am, at this point, tentatively concluding that it was error to tie the 1101(b) evidence to the 422." Following additional briefing, the court accurately noted that the instruction did not so permit—"[T]he instructions that were given to the jury told them that they could consider the 1101 evidence for purposes that are not connected to any of the elements of the 422 charge"—and thus that it had not erred in providing the instruction. We agree.

Finally, Rodgers's argument at best is an argument that the instruction should have been clarified so there was no possibility the jury would understand it as applying to the criminal threats charge. This argument is forfeited because Rodgers has not shown that she requested clarification of the instruction during trial. (See *People v. Lang* (1989) 49 Cal.3d 991, 1024.)

### III. DISPOSITION

The judgment is affirmed.

_____
Bruiniers, J.

We concur:

_____
Jones, P. J.

_____
Needham, J.

10